Nos. 23-1953, 23-2241

# In the United States Court of Appeals
# for the Third Circuit

NATIONAL LABOR RELATIONS BOARD,
*Petitioner/Cross-Respondent.*

*v.*

STARBUCKS CORPORATION, D/B/A STARBUCKS COFFEE COMPANY,
*Cross-Petitioner/Respondent,*

*On Review from the National Labor Relations Board,*
*Nos. 04-CA-252338 et al.*

## BRIEF OF CROSS-PETITIONER/RESPONDENT

MAURICE BASKIN
LITTLER MENDELSON, PC
  *815 Connecticut Ave, N.W.,*
  *Ste. 400*
  *Washington, D.C. 20006*

LISA S. BLATT
  *Counsel of Record*
SARAH M. HARRIS
AARON Z. ROPER
EDWARD L. PICKUP
JOSHUA A. HANLEY*
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Admitted in Pennsylvania and practicing law in the District of Columbia pending application for admission to the D.C. Bar under the supervision of bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

## CORPORATE DISCLOSURE STATEMENT

Petitioner and Cross-Respondent Starbucks Corporation ("Starbucks") is a Washington state corporation that operates over 9,000 retail locations across the United States.  Starbucks has no parent corporation, no publicly held corporation owns more than 10% of Starbucks' stock, and no publicly held company has a 10% or greater ownership interest in Starbucks.

Dated: December 1, 2023

*/s/ Lisa S. Blatt*
LISA S. BLATT

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................1

JURISDICTIONAL STATEMENT ......................................................5

ISSUES PRESENTED ........................................................................5

STATEMENT OF RELATED CASES AND PROCEEDINGS ...................6

STATUTES.........................................................................................6

STATEMENT OF THE CASE .............................................................6

    A.    Factual Background ...........................................................6

    B.    Administrative Proceedings ............................................13

STANDARD OF REVIEW .................................................................18

SUMMARY OF ARGUMENT.............................................................18

ARGUMENT ....................................................................................23

I.     NLRB ALJs Are Unconstitutionally Insulated from Presidential
     Accountability .............................................................................23

II.    The Board's Decision Violates the Substantial-Evidence
     Standard .....................................................................................30

    A.    The NLRB's Finding of Unlawful Terminations Ignored
         Evidence of Repeated Policy Violations and Disruption..............30

    B.    The NLRB's Finding of Unlawfully Reduced Hours
         Ignored Business and Performance Justifications .......................40

III.   Nowakowska's and Bussiere's Violation of Starbucks' Recording
     Policy Precludes Reinstatement and Backpay .............................42

IV.   The NLRB's Damages Remedy Is Unlawful...................................51

    A.    The NLRB Awarded Compensatory Damages............................52

    B.    The NLRA Does Not Authorize Compensatory Damages..........53

    C.    Reading the NLRA to Permit Compensatory Damages
         Would Raise Multiple Constitutional Problems...........................59

    D.    The Board's Remedy Violates Due Process as Applied
         Here .............................................................................65

CONCLUSION..................................................................................67

STATUTORY ADDENDUM ..............................................................1a

# TABLE OF AUTHORITIES

Page

Cases:

*1621 Route 22 W. Operating Co. v. NLRB*, 825 F.3d 128 (3d Cir. 2016) ...42, 50

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ...........65

*ADT, LLC*, 369 NLRB No. 23, 2020 WL 591740 (2020) ...............................47, 48

*Advanced Disposal Servs. E. v. NLRB*, 820 F.3d 592 (3d Cir. 2016) ..... *passim*

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) ........................................57

*Apache Corp. v. FCC*, 627 F.3d 1220 (D.C. Cir. 2010) ....................................50

*AT&T Mobility, LLC*, 370 NLRB No. 121, 2021 WL 1815083 (2021) ............48

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ................................................28

*Blanca Tel. Co. v. FCC*, 991 F.3d 1097 (10th Cir. 2021) .................................66

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) .........................................66

*Burton v. Schamp*, 25 F.4th 198 (3d Cir. 2022) ...............................................59

*Carlini v. Glenn O. Hawbaker, Inc.*, 219 A.3d 629 (Pa. Super. Ct. 2019) .......53

*Carr v. Saul*, 141 S. Ct. 1352 (2021) ...............................................................28

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ...................................................26, 29

*Cortez Byrd v. Chips, Inc. v. Bill Harbert Constr. Co.*,
   529 U.S. 193 (2000) ....................................................................................56

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) ...............61

*Curtis v. Loether*, 415 U.S. 189 (1974) ...............................................56, 61, 63

*Edmond v. United States*, 520 U.S. 651 (1997) ................................................25

*Ex parte Lennon*, 166 U.S. 548 (1897) .............................................................54

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ............................65

*FDRLST Media, LLC v. NLRB*, 35 F.4th 108 (3d Cir. 2022) ....................30, 35

*Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976) ....................................58

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) ...................................*passim*

*Freytag v. Comm'r*, 501 U.S. 868 (1991) ..........................................................25

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015) ...................66

*Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973) .................................55

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) .....................................61

*Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ...............54

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ..............................................64

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022),
   *cert. granted*, 143 S. Ct. 2688 (2023) .................................................27, 29, 60

*King Soopers, Inc.*, 364 NLRB 1153 (2016), *enf'd in relevant part*,
   859 F.3d 23 (D.C. Cir. 2017) ......................................................................66

iii

Page

Cases—continued:

*Lucia v. SEC*, 138 S. Ct. 2044 (2018) ....................................................25

*Marshall Durbin Poultry Co.*, 310 NLRB 68 (1994),
  enf'd in part 39 F.3d 1312 (5th Cir. 1994) ...............................42

*McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995) ...............44

*MCPC, Inc. v. NLRB*, 813 F.3d 475 (3d Cir. 2016) ................................*passim*

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) ..........................53, 61

*Mushroom Transp. Co. v. NLRB*, 330 F.2d 683 (3d Cir. 1964)...........48, 50

*Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ........................64

*Nat'l Licorice Co. v. NLRB*, 309 U.S. 350 (1940) ................................62

*NLRB v. ImageFIRST Unif. Rental Serv., Inc.*,
  910 F.3d 725 (3d Cir. 2018) ..........................................*passim*

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) .......................62

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018) ................................................60

*Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935) ................................65

*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177 (1941) ..............................55

*PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016) (Kavanaugh, J.),
  reinstated in relevant part, 881 F.3d 75 (D.C. Cir. 2018) (en banc)..........67

*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001)................57

*Rapid Mfg. Co. v. NLRB*, 612 F.2d 144 (3d Cir. 1979) ........................46

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945) ................................55

*Salazar v. Buono*, 559 U.S. 700 (2010) ........................................55

*SEC v. Jarkesy*, No. 22-859 (argued Nov. 29, 2023) ..............*passim*

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ................................23

*Shapiro v. SSA*, 800 F.3d 1332 (Fed. Cir. 2015)................................26

*Smith v. Atlas Off-Shore Boat Serv., Inc.*,
  653 F.2d 1057 (5th Cir. Unit A Aug. 1981)..............................53

*Squires v. Bonser*, 54 F.3d 168 (3d Cir. 1995) ................................56

*Stardyne, Inc. v. NLRB*, 41 F.3d 141 (3d Cir. 1994) ..........................50

*State Farm v. Campbell*, 538 U.S. 408 (2003)..................................52

*Stephens Media, LLC*, 356 NLRB 661 (2011) ................................48

*Stern v. Marshall*, 564 U.S. 462 (2011)....................................60, 61

*Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951 (Dec. 13 2022) ........*passim*

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
  5 F.4th 666 (6th Cir. 2021) ..........................................64

Page

Cases—continued:

*Trafford Distrib. Ctr. v. NLRB*, 478 F.3d 172 (3d Cir. 2007) ..........................18
*UAW-CIO v. Russell*, 356 U.S. 634 (1958) .....................................................54
*United States v. Burke*, 504 U.S. 229 (1992).................................................57
*United States v. Cooper*, 750 F.3d 263 (3d Cir. 2014) ................................64
*Whole Foods Mkt., Inc.*, 363 NLRB 800 (2015).................................47, 49, 50
*Wright Line*, 251 NLRB 1083 (1980)........................................31, 36, 40
*Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022)...................................58

Constitution, Statutes, Regulations, and Rule:

U.S. Const.,
    art. I .....................................................................................................64
    art. II ............................................................................................ *passim*
    art. III ........................................................................................... *passim*
    amend. VII .................................................................................... *passim*
Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ..................1, 2, 50
5 U.S.C.
    § 706 ....................................................................................................18
    § 7521 ..................................................................................................26
29 U.S.C.
    § 187 .....................................................................................................58
    § 1202 ..................................................................................................27
    § 1855 ..................................................................................................58
    § 2617 ..................................................................................................58
National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*.............. *passim*
    § 153(a) ...............................................................................................26
    § 157....................................................................................................47, 48
    § 160(b) .................................................................................................5
    § 160(c) ....................................................................................... *passim*
    § 160(e) ................................................................................................27
    § 160(e)-(f) .................................................................................5, 18, 30
42 U.S.C. § 1983 ......................................................................................56
Civil Rights Act, § 706(g), 42 U.S.C. § 2000e-5............................57, 58
18 Pa. Cons. Stat. Ann. § 5703 .............................................................11, 43

Page

Constitution, Statutes, Regulations, and Rule—continued:

29 C.F.R.

§ 102.35...................................................................................25
§ 102.48...................................................................................25

3d Cir. R. 28.1...............................................................................6

Other Authorities:

Samuel L. Bray, *The System of Equitable Remedies*,
63 UCLA L. Rev. 530 (2016)..................................................54

*Hearing on S. 2926 Before the S. Comm on Educ. & Lab.*,
73d Cong. 362 (1934), *reprinted in* 1 NLRB, *Legislative History of
the National Labor Relations Act, 1935* (1949) ............................59

NLRB, *Casehandling Manual, Part 3, Compliance Proceedings*
(Oct. 19, 2020), https://tinyurl.com/rfbwchwd
§ 10506.9.................................................................................28
§ 10536.1.................................................................................53

S. 2926, 73d Cong. § 205(c) (as introduced Mar. 1, 1934), *reprinted in*
1 NLRB, *Legislative History of the National Labor Relations Act,
1935* (1949) ..........................................................................59

Howard Schultz, *Statement Before the Senate Committee on Health,
Education, Labor, and Pensions* (Mar. 29, 2023),
https://tinyurl.com/ydh7phk7 ...................................................7

Starbucks, *Culture and Values* (2023), https://tinyurl.com/2trtbaam..............7

Starbucks, *Our Long-Standing Efforts to Put Our Partners First*
(Mar. 13, 2023), https://tinyurl.com/m8yfj48d ..............................7

## INTRODUCTION

The cornerstone of Starbucks' business is that customers' positive inter-actions with baristas—not just the coffee—will draw customers back. Star-bucks calls its employees "partners" because they each have an ownership stake in the future success of the business. Starbucks respects its partners' right to organize under the National Labor Relations Act (NLRA), and takes seriously charges of unfair labor practices.

But when resolving such charges, the National Labor Relations Board (NLRB) must abide by the Constitution, as well as the rules set out in the NLRA and the Administrative Procedure Act (APA). When, as here, the NLRB disregards those rules, it sacrifices accountability and fairness to em-ployers and employees alike.

This case centers on Starbucks' termination of Echo Nowakowska and Tristan Bussiere, former baristas at a Philadelphia Starbucks who racked up numerous violations of Starbucks' policies in their year with the company. At the same time, the two grew involved in labor organizing—conduct that the NLRA undisputedly protects. The NLRB found that Starbucks fired these partners for their labor organizing, rejecting Starbucks' explanation that these partners had persistently violated company policies and expectations.

1

The NLRB then ordered Starbucks to reinstate the two with compensation for all "direct or foreseeable pecuniary harms." That order warrants vacatur on multiple independent grounds.

*First*, the presiding Administrative Law Judge (ALJ) was unconstitutionally insulated from presidential control and supervision. Under Article II, the President must ensure that inferior executive officers, like ALJs, are properly executing the law. But three levels of removal protection insulate NLRB ALJs from presidential control. Under the Supreme Court's decision in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), such multilayer tenure protections are unconstitutional. The Supreme Court is currently considering a similar challenge to ALJ removal protections in *SEC v. Jarkesy*, No. 22-859 (argued Nov. 29, 2023).

*Second*, the NLRB's determination that Starbucks engaged in unfair labor practices is not backed by substantial evidence. The NLRA and the APA require the NLRB to weigh all of the evidence in context and reach a decision that reflects the record as a whole. But here, the Board sidestepped Nowakowska's and Bussiere's repeated policy violations, which amply justified their terminations. Based on their own testimony—not to mention other

record evidence—the facts show that Nowakowska was combative and insubordinate for months, culminating in an argument with a customer over two pats of butter. And Bussiere repeatedly fell below basic expectations and disrupted his workplace. The NLRA does not compel employers to retain employees who yell at customers and poison their work environment just because the employees happen to support labor organizing.

*Third*, the NLRB improperly ordered Starbucks to reinstate Nowakowska and Bussiere with backpay despite the subsequent revelation that they pervasively and secretly recorded coworkers and customers, in violation of Starbucks policy and Pennsylvania law. The NLRA does not require employers to reinstate employees or pay full backpay when evidence later comes to light that would have independently prompted employees' termination.

The Board rejected this defense on the grounds that Starbucks knew about the recordings in advance and, in any event, that the NLRA protects workplace recordings. But no evidence, much less substantial evidence, establishes Starbucks' actual knowledge of the recordings before the firings. And the NLRA's text and NLRB precedent refute the notion that the NLRA protects the kind of mass coworker and customer recordings that occurred here.

*Fourth*, the Board's imposition of compensatory damages exceeds the Board's statutory authority. Before 2022, longstanding NLRB precedent recognized that the NLRB could award only reinstatement, backpay, and limited employment-related expenses. But in December 2022, the NLRB, by a 3-2 vote, pivoted to a sweeping new policy requiring compensation of all "direct or foreseeable pecuniary harms" from unfair labor practices. *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951, at *9-10 (Dec. 13 2022).

This is one of the first cases where the Board imposed that new remedy, which the NLRA nowhere authorizes. Section 10(c) of the Act confines the Board to ordering *equitable* relief, namely, to ceasing unfair labor practices or taking "affirmative action," like reinstatement, "as will effectuate the policies of" the Act. 29 U.S.C. § 160(c). The Act thus excludes compensatory damages—quintessential *legal* relief. The Board's contrary view raises serious constitutional concerns under Article III and the Seventh Amendment, which prohibit agencies from adjudicating traditional private damages actions. The Board's unbounded interpretation of its remedial power also triggers concerns under the nondelegation doctrine. At minimum, this Court should vacate the NLRB's damages remedy here, because the Board violated due process by depriving Starbucks of any notice of its impending volte-face on penalties.

4

## JURISDICTIONAL STATEMENT

The NLRB had jurisdiction over this unfair-labor-practice proceeding under 29 U.S.C. § 160(b).  The NLRB issued its order on February 13, 2023, and denied reconsideration on June 30, 2023, rendering its decision final.  The NLRB filed its application for enforcement on May 24, 2023, and Starbucks cross-petitioned for review on July 7, 2023.  This Court has jurisdiction over the NLRB's application and Starbucks' cross-petition under 29 U.S.C. § 160(e)-(f) because the alleged unfair labor practices occurred in this Circuit.  These petitions are timely because the NLRA imposes no deadlines for review.

## ISSUES PRESENTED

1.  Whether the NLRB ALJ's three layers of removal protection from presidential oversight violate Article II.  *See Advanced Disposal Servs. E. v. NLRB*, 820 F.3d 592, 598-600 (3d Cir. 2016) (issue exhaustion not required for structural constitutional challenges to NLRB proceedings).

2.  Whether substantial evidence supports the NLRB's conclusion that Starbucks committed unfair labor practices by firing Nowakowska and Bussiere and cutting Nowakowska's hours, notwithstanding the NLRB's failure to adequately consider countervailing evidence of their repeated violations of company policy and disciplinary actions.  *See* JA9-10, 32-36, 1880-99, 1953-61.

3.    Whether after-acquired evidence that Nowakowska and Bussiere broke company rules and violated Pennsylvania law by making surreptitious audio recordings in public areas of the store independently justifies their terminations, precluding reinstatement with backpay.  *See* JA10-13, 36-38, 43-47, 1911-19, 1944-53, 1974-78.

4.    Whether section 10(c) of the NLRA, which authorizes "affirmative action, including reinstatement of employees with or without back pay," permitted the NLRB to order Starbucks to pay damages for "direct or foreseeable pecuniary harms."  *See* JA7 n.3, 47, 1978-83.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court.  Starbucks is unaware of any related case within the meaning of 3d Cir. R. 28.1(a)(2).

## STATUTES

Pertinent statutes are reproduced in an addendum to this brief.

## STATEMENT OF THE CASE

### A.    Factual Background

1.  Starbucks is America's largest coffee purveyor, operating locations everywhere from Allentown to Zanesville.  In the United States alone, Starbucks employs some 235,000 people, who are "partners," reflecting Starbucks'

6

conviction that its people—along with its coffee—lie at the heart of its business. Starbucks, *Culture and Values* (2023), https://tinyurl.com/2trtbaam; *see* Starbucks, *Our Long-Standing Efforts to Put Our Partners First* (Mar. 13, 2023), https://tinyurl.com/m8yfj48d.

To that end, Starbucks offers its partners opportunities to develop their careers, promoting many baristas to management and paying up to 100% of their college tuition. Howard Schultz, *Statement Before the Senate Committee on Health, Education, Labor, and Pensions* 2 (Mar. 29, 2023), https://tinyurl.com/ydh7phk7. Starbucks also offers "industry-leading benefits," ranging from comprehensive health care and stock ownership to student loan assistance, paid sick leave, and backup child care. *Id.*

But, as Starbucks' policies in its Partner Guide detail, partners who fall below Starbucks' expectations and fail to deliver top-level customer service are let go. That Guide articulates Starbucks' policies for taking "corrective action" or "separat[ing]" employees. JA1029. Per those policies—which partners agree to upon joining—Starbucks will take corrective action if a partner fails to meet performance expectations or otherwise "engag[es] in unacceptable behavior." JA1029. Managers have discretion to calibrate corrective actions "depend[ing] on the seriousness of the situation." JA1029. Managers

7

may choose "a verbal warning, a written warning, demotion, suspension or separation from employment." JA1029. And Starbucks may "immediate[ly] separat[e]" partners who engage in "serious misconduct" like "abusive behavior toward … customers" or "[i]nsubordination." JA1029.

2. This case involves the termination of two former Starbucks partners, Echo Nowakowska and Tristan Bussiere, who worked at a Philadelphia Starbucks at the intersection of South Broad Street and Washington Avenue from 2018 until January and February 2020, respectively. JA18, 160, 316. Relevant here are three decisions Starbucks made about Nowkowska's and Bussiere's employment, each of which the Board held that the NLRA prohibits.

*First*, starting in September 2019, Starbucks reduced Nowakowska's hours as part of an across-the-board cut designed to bring staffing in line with customer demand. By late September, baristas were collectively scheduled for about 310 hours, but by December, their collective total scheduled hours plummeted to around 240. JA653-54, 666. Starbucks thus trimmed partners' schedules at the store, including Nowakowska's. JA237-38, 463.

*Second*, on January 26, 2020, Starbucks discharged Nowakowska for poor service and rudeness to customers. Nowakowska's termination notice

8

described how on October 23 and 29, 2019, she received coaching for poor customer service—specifically, slamming drinks on the counter and failing to greet or thank customers.  JA20-21, 1436.  The notice also recounted repeated reprimands for demeaning customers.  In one incident, Nowakowska allegedly told a customer who did not want much ice "to make the beverage yourself."  JA1436.  In another incident involving an argument with a customer, Nowakowska reportedly asked that customer, "can you read?"  JA1436.  And Nowakowska herself admitted that she had a "back and forth" with a customer who she believed was misusing a promotion for free tea bags.  JA278.  When the customer asked for butter, Nowakowksa exclaimed:  "[N]ow you want free butter?"  JA1436; *see* JA279.

*Third*, on February 26, 2020, Starbucks fired Bussiere for two reasons: spreading a false rumor and serially disrupting his colleagues.  Bussiere's termination notice described how on February 16, he "knowingly" spread "false information" about another barista's rumored discharge—an act that Starbucks deemed "inappropriate, disrespectful, and cruel."  JA1456.  The notice explained that incident was merely the latest example of Bussiere "disrupting operations and partners while they are working."  JA1456.

9

3.  Nowakowska, Bussiere, and eventually the Board instead attributed those employment decisions to Nowakowska's and Bussiere's involvement in labor organizing.  In mid-2019, Nowakowska and Bussiere began speaking with One PA, a nonprofit advocacy organization.  JA163, 317.  Thereafter, they organized meetings with other Starbucks partners to discuss grievances concerning their then-store manager, Erin Graves.  JA161-63, 317.  After filing an internal complaint about Graves, on July 22, 2019, Nowakowska and Bussiere led demonstrators into the store during business hours to demand Graves' removal.  JA165-68, 317-18.

Starbucks management repeatedly met with Nowakowska and Bussiere to discuss the partners' concerns.  JA190-91, 204-05, 318-22.  Starbucks assured the pair that Starbucks prohibits retaliation against partners who file complaints.  JA303-04, 576; *see* JA1011-12.  Starbucks even assigned an investigator to review Nowakoska's and Bussiere's allegations.  JA19, 322-23.  In August 2019, Graves resigned after hearing management's concerns from the investigation.  JA512, 586.

In November 2019, Nowakowska and Bussiere led a second demonstration, delivering a formal, unfair-labor-practices charge to a Starbucks district manager at the store during business hours.  JA22, 247-48, 334.  Bussiere

posted the ensuing *Philadelphia Inquirer* coverage of the demonstration on a public social-media page.  JA339, 342, 762.  Starbucks discovered the post because the company monitored all public social-media posts mentioning Starbucks.  JA144-45.

4.  After Nowakowska and Bussiere were terminated and administrative proceedings before the NLRB ensued, evidence emerged that they had frequently recorded Starbucks' managers, fellow partners, and even customers.  Those recordings violated Starbucks' policies, which prohibit "audio recording … of other partners or customers in the store without their consent … unless authorized by law."  JA1018.  Starbucks' policies track Pennsylvania law, under which "intentionally intercept[ing] … any … oral communication" without consent is a felony.  18 Pa. Cons. Stat. Ann. § 5703(1).

Nowakowska admitted to making four secret recordings during meetings with her manager, David Vaughan, and other Starbucks management.  JA294, 311-12.  Two of those meetings occurred in a staff-only area; two were held in the open customer area of the café.  JA190-91, 204-05, 220, 294.

Bussiere's recording was more extensive.  Initially, he only recorded meetings with management.  JA353.  But starting in October 2019, four months before his firing, Bussiere started recording entire shifts "any time

[he] was working with" Manager Vaughan.  JA353.  Bussiere would slip away to the back room or bathroom to start his recorder and leave the device running until he or Vaughan left for the day.  JA353-54.  Bussiere deleted many of these recordings, but admitted to making "[p]robably 30 or a little bit more." JA353-54.

On at least two occasions, Manager Vaughan asked Nowakowska and Bussiere not to record him.  Once, Bussiere approached Vaughan to ask about scheduling with his phone to his side.  JA434.  When Vaughan asked Bussiere not to record, Bussiere said, "I'm not recording you."  JA434.  On another occasion, Nowakowska pulled out her phone to try to record Vaughan, who immediately ended the conversation and mentioned the incident to the district manager.  JA435.  Around this time, a Starbucks management coach assisting Vaughan mentioned "[p]artners videoing conservations between [Vaughan] & themselves" in an email to the district manager.  JA807.

Starbucks' only other potential indication that Nowakowska and Bussiere may have made recordings were editorialized accounts that Bussiere sent Vaughan and the district manager of conversations with Vaughan. JA677-94, 1442-52.  To get to the bottom of how Bussiere constructed these purported transcripts, Starbucks subpoenaed Nowakowska and Bussiere for

any recordings they may have made. JA38 n.56. Ultimately, during ALJ proceedings, Nowakowska and Bussiere admitted to repeatedly recording managers, coworkers, and customers—which violated Starbucks' policies. JA306-07, 310, 353.

### B.    Administrative Proceedings

1. ***NLRB Complaint.***  Beginning in November 2019, Nowakowska, Bussiere, and Philadelphia Baristas United filed a series of unfair-labor-practice charges against Starbucks with the NLRB. JA604-05. In August 2020, the NLRB issued a consolidated complaint against Starbucks alleging unfair labor practices in violation of sections 8(a)(1) and (3) of the NLRA. Relevant here, the complaint alleged that Starbucks retaliated against Nowakowska and Bussiere for engaging in union activities by reducing Nowakowska's hours and terminating the pair. JA607. Starbucks denied those charges, maintaining that it cut Nowakowska's hours as part of an across-the-board staffing reduction and fired both partners for repeatedly violating Starbucks' policies.

2. ***The ALJ's Decision.***  In a June 2021 decision, the ALJ concluded that Starbucks fired both partners and reduced Nowakowska's hours in retaliation for their labor organizing.

As to Nowakowska's termination, the ALJ held that her protected activities—participation at organizing meetings and demonstrations—motivated Starbucks to fire her.  JA31, 34-35.  The ALJ disagreed that Starbucks would have terminated her regardless due to myriad disciplinary issues.  JA35. Though the ALJ acknowledged—and Nowakowska admitted—that she had been "intemperate and rude" during a January 2020 back-and-forth with a customer over free butter, the ALJ refused to credit managers' testimony about two other incidents showing Nowakowska's rudeness to customers. JA25-26 & n.29, 35.

The ALJ did not believe that the butter incident alone warranted termination; in the ALJ's view, Starbucks had not terminated other partners for similar infractions.  JA35.  But by treating that incident as "isolated," the ALJ ignored other occasions on which Nowakowska admittedly violated Starbucks policy—for instance, "yelling" at a store manager and failing to call out drink orders as instructed.  JA222, 262.

As to Bussiere, the ALJ likewise held that Starbucks fired him for protected activity, including attending union meetings and staging demonstrations.  JA36.  The ALJ rejected Starbucks' explanation that the company fired

14

Bussiere for two separate reasons:  spreading a false rumor that another part-ner was about to be fired and persistently disrupting colleagues.  JA27.  The ALJ found that Starbucks had not offered evidence that "Bussiere *knew the rumor*" was false and believed Bussiere spread the rumor to warn a colleague that his job was in danger.  JA36.

The ALJ did not explain why Bussiere's disruptiveness was not a suffi-cient ground for termination.  JA36.  The ALJ merely held that Starbucks could not rely on a November 21 a warning it gave Bussiere to establish dis-ruptiveness because the ALJ had deemed the warning itself an unfair labor practice.  JA22, 33, 36.  Yet the ALJ sidestepped other undisputed evidence demonstrating Bussiere's misconduct.  *See, e.g.*, JA21 n.15, 27 n.30, 326-27, 331.

Finally, the ALJ held that Nowakowska's reduction in hours was retali-ation for her labor organizing.  JA32-33.  The ALJ dismissed Starbucks' evi-dence that Nowakowska's hours dropped as part of an across-the-board cut, faulting Starbucks for purportedly not explaining why Nowakowska suffered one of the largest reductions.  JA33.  But the ALJ ignored evidence that Nowakowska worked the same number of hours as other partners after the cuts.  JA1714-15, 1720-21.

As to remedies, Starbucks raised the after-acquired evidence that Nowakowska and Bussiere had been surreptitiously recording customers and other Starbucks partners.  Starbucks argued that reinstatement was inappropriate because, had Starbucks known of the secret recordings—which violated both Starbucks policy and Pennsylvania law—Starbucks would have fired them as of the date Starbucks learned of those recordings.  The ALJ rejected that defense, holding that Starbucks already "knew or had reason to know" that Nowakowska and Bussiere were recording, so the recordings could not serve as "after-acquired evidence" that would bar reinstatement.  JA36-38.

The ALJ ordered Starbucks to reinstate Nowakowska and Bussiere with backpay and benefits, and to pay any expenses Nowakowska and Bussiere incurred searching for work or taking temporary jobs.  JA39.  Finally, the ALJ ordered Starbucks to post notices of employees' labor rights in two of its Philadelphia stores and to stop interfering with those rights.  JA39-40.

3. ***The Board's Decision.***  On the merits, the NLRB adopted the ALJ's findings that Starbucks unlawfully reduced Nowakowska's hours and fired Nowakowska and Bussiere.  JA9-10.

16

The Board also rejected Starbucks' defense that it would have fired Nowakowska and Bussiere regardless had it known about their secret recordings. JA10-13. The Board refused to apply the ALJ's "reason to know" test and instead held that Starbucks actually "knew" that Nowakowska and Bussiere were recording others. JA11 & n.19. Alternatively, the Board held that Starbucks could not lawfully have fired Nowakowska and Bussiere for their secret recordings—even if they violated company policy and Pennsylvania law—because the NLRA protects recordings made "to preserve evidence" of potential unfair labor practices. JA11-12.

The Board then *sua sponte* expanded the ALJ's remedy to encompass compensatory damages flowing from the alleged unfair-labor practices, citing the Board's recent 3-2 decision in *Thryv, Inc.*, 2022 WL 17974951, *review pending*, No. 23-60132 (5th Cir.). In *Thryv*, the Board "revisit[ed]" its precedent and held that employers henceforth must pay employees "*all direct or foreseeable pecuniary harms* suffered as a result of [an] unfair labor practice." *Id.* at *9. The Board expected "myriad" harms would now qualify, including credit-card late fees or debt, retirement-account penalties, lost homes or cars, transportation or childcare costs, out-of-pocket medical expenses, and "other costs simply in order to make ends meet." *Id.* at *14-15 (citation omitted).

17

The Board denied Starbucks' motion for reconsideration objecting to this new remedy, deeming Starbucks' objections foreclosed by *Thryv*. JA47. The Board also declined to revisit its conclusions that Starbucks knew about Nowakowska's and Bussiere's recordings and that the NLRA does not protect blanket secret recordings of "fellow employees … as well as customers." JA43-44, 46.

## STANDARD OF REVIEW

Where, as here, the Board partially adopts an ALJ's decision, this Court "reviews both." *Trafford Distrib. Ctr. v. NLRB*, 478 F.3d 172, 179 (3d Cir. 2007). This Court "applies a plenary standard" of review to "questions of law and the NLRB's application of legal precepts." *NLRB v. ImageFIRST Unif. Rental Serv., Inc.*, 910 F.3d 725, 732 (3d Cir. 2018); *see* 5 U.S.C. § 706. This Court reviews the Board's "[f]actual findings" for "substantial evidence." *ImageFIRST*, 910 F.3d at 732 (citing 29 U.S.C. § 160(e)-(f)). Under that standard, the Board must support its conclusions with "relevant evidence," and may not ignore facts that "detract[]" from its position. *Advanced Disposal*, 820 F.3d at 606 (citation omitted).

## SUMMARY OF ARGUMENT

The Board's order warrants vacatur for four independent reasons.

I.  The ALJ's three layers of insulation from presidential oversight violate Article II.  The Supreme Court is currently considering this issue in *Jarkesy*, No. 22-859.  But even under existing precedent, the answer is clear. The Supreme Court has held that "multilevel" for-cause removal protections unconstitutionally impede the President's control of the Executive Branch. *Free Enter. Fund*, 561 U.S. at 484.  NLRB ALJs are removable only for cause. And that removal may only be initiated by the NLRB—whose members are removable only for cause—and completed by the Merit Systems Protection Board (MSPB)—whose members too are removable only for cause.  Those three layers of insulation violate Article II.  Because Starbucks faces the prospective harm of further proceedings before an unconstitutionally insulated ALJ, this Court should vacate and remand for proceedings before a constitutionally accountable adjudicator.

II.  The NLRB's order violates the substantial-evidence standard by failing to consider abundant record evidence refuting the Board's conclusions.

The NLRB found that Starbucks fired Nowakowska and Bussiere for labor organizing.  But employers do not violate the NLRA when independent,

19

non-protected reasons explain terminations. Here, the Board and its ALJ ignored significant evidence that Nowakowska's and Bussiere's repeated violations of Starbucks' policies justified their firings.

The record establishes that Nowakowska was routinely rude and insubordinate, raised her voice with her manager, and even customers, in the middle of the store. And Bussiere regularly damaged store morale—coming late to work, arguing with managers, failing to stock merchandise, and spreading false rumors about coworkers. Those repeated infractions amply explain Nowakowska's and Bussiere's terminations independent of any protected labor activity. Likewise, the NLRB's conclusion that Starbucks retaliated against Nowakowska by reducing her hours overlooked that this reduction was part of across-the-board cuts that fully explain Nowakowska's changed hours.

III. The NLRB also erred in ordering reinstatement with backpay because after-acquired evidence that Nowakowska and Bussiere secretly recorded coworkers and customers without their consent independently justifies their terminations. Secretly recording coworkers and customers destroys workplace morale and grievously invades others' privacy—as Starbucks policy

20

and Pennsylvania law both recognize by prohibiting such recordings. No evidence supports the NLRB's conclusion that Starbucks knew about these recordings before terminating the two baristas. At most, Starbucks suspected Nowakowska and Bussiere had each unsuccessfully attempted to record *managers* one time. Further, the NLRB misconstrued the NLRA in concluding that Nowakowska's and Bussiere's secret recordings were protected activity. In particular, recording *customers* is a serious intrusion that federal law does not authorize.

IV. At minimum, this Court should vacate the Board's new remedy, which would require Starbucks to pay Nowakowska and Bussiere for all "direct or foreseeable pecuniary harms" of their firings. JA7 n.3. That remedy amounts to compensatory damages—money paid to Nowakowska and Bussiere to remedy economic injuries they allegedly suffered as a result of Starbucks' actions.

Section 10(c) of the NLRA does not authorize compensatory damages. That provision only authorizes the Board to order employers to cease unfair labor practices and take "affirmative action … as will effectuate the policies of" the Act. 29 U.S.C. § 160(c). That language limits the Board to traditional

*equitable* remedies—compelling action or inaction.  Section 10(c) does not authorize *legal* remedies like compensatory damages.  The Supreme Court has long described the NLRB's authority in equitable terms.  And the rest of section 10(c), other statutes, and legislative history confirm that compensatory damages exceed the NLRB's power.

Reading section 10(c) to authorize compensatory damages would also raise serious constitutional concerns.  Article III and the Seventh Amendment require federal courts and juries—not agencies—to adjudicate private rights between individuals.  The NLRB's reading also raises serious concerns under the nondelegation doctrine, which requires Congress to articulate an intelligible principle when delegating discretion to agencies.  On the NLRB's view, nothing limits the Board's remedial powers save the Board's own policy views.

In all events, the damages award here should be vacated for lack of notice.  In 2019 and 2020, when the alleged unfair labor practices occurred, NLRB precedent authorized only reinstatement, backpay, and limited employment-related damages.  The Board's *sua sponte* imposition of damages for "all direct or foreseeable pecuniary harms" without notice to Starbucks of the potential penalty violates due process.

# ARGUMENT

## I.  NLRB ALJs Are Unconstitutionally Insulated from Presidential Accountability

The Supreme Court is currently considering the constitutionality of ALJs' multilayer removal protections.  *Jarkesy*, No. 22-859 (argued Nov. 29, 2023).  Because this case presents a similar question, this Court may wish to await the outcome of those proceedings.  Regardless, under existing Supreme Court precedent, the bottom line should be clear:  The NLRB ALJ who rendered a decision here is unconstitutionally insulated from presidential oversight.  The Supreme Court has already held that two layers of for-cause removal unconstitutionally "strip[]" the President of his "ability to execute the laws … by holding his subordinates accountable for their conduct." *Free Enter. Fund*, 561 U.S. at 496.  NLRB ALJs' *three* layers of for-cause removal protections make them even less accountable.

1.  The President alone possesses the entire "executive Power," U.S. Const. art. II, § 1, but may use "other Officers of the United States," *id.* § 2, to help ensure that "the Laws [are] faithfully executed," *id.* § 3.  But the President must have some "power of removing those" lower-level officers.  *Free Enter. Fund*, 561 U.S. at 493 (citation omitted); *accord Seila Law LLC v.*

*CFPB*, 140 S. Ct. 2183, 2197-98 (2020). Thus, "multilevel protection from removal is contrary to Article II's vesting of the executive power in the President." *Free Enter. Fund*, 561 U.S. at 484. Congress cannot "restrict[]" both the President's "ability to remove a principal officer" (like the Board and other agency heads) *and* the principal officer's "ability to remove an inferior officer" (like an ALJ). *See id.*

Accordingly, the Supreme Court in *Free Enterprise Fund* held unconstitutional the dual-level protections insulating the Public Company Accounting Oversight Board, a body of inferior officers within the SEC. *Id.* at 492. The President could remove SEC Commissioners (the heads of the department) only for cause, and the Commissioners, in turn, could remove Oversight Board members only for cause. *Id.* 495-96. That scheme destroyed presidential oversight and accountability: "Neither the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the Board." *Id.* at 496.

2. Under Supreme Court precedent, the NLRB ALJ's three-level insulation from presidential supervision is unconstitutional.

a. NLRB ALJs are plainly "inferior officers" within the Executive Branch. Inferior officers exercise "significant authority pursuant to the laws

of the United States" under the "direct[ion] and supervis[ion]" of "higher ranking officer[s]." *Edmond v. United States*, 520 U.S. 651, 662-63 (1997). Executive-branch adjudicators, including ALJs, are inferior officers. *See Lucia v. SEC*, 138 S. Ct. 2044, 2051 n.3 (2018); *Freytag v. Comm'r*, 501 U.S. 868, 881 (1991).

NLRB ALJs are no different. They exercise significant executive authority as masters of the NLRB's front-line adjudicative process. ALJs administer oaths, grant subpoena applications, decide on the admissibility of evidence, conduct hearings, and even "exclude persons" from hearings for "contemptuous conduct." 29 C.F.R. § 102.35(a). And ALJs' decisions "automatically become the decision and order of the [NLRB]," unless a party appeals. *Id.* § 102.48; *see Lucia*, 138 S. Ct. at 2054. ALJs are thus classic inferior officers. *See Lucia*, 138 S. Ct. at 2053.[1]

b. Despite exercising significant executive power, neither the President nor "a subordinate he could remove at will" can remove NLRB ALJs. *See*

---

[1] To be sure, *Free Enterprise Fund* did "not address" the constitutionality of ALJs' removal protections. 561 U.S. at 507 n.10. But the Court avoided that issue largely because it had not yet decided whether "administrative law judges [were] … Officers of the United States." *Id.* The Court has since confirmed that ALJ's are "Officers of the United States." *Lucia*, 138 S. Ct. at 2054. Thus, ALJs may not have multilayer removal protection.

*Free Enter. Fund*, 561 U.S. at 495. Instead, NLRB ALJs have three layers of removal protection, making them "immune from Presidential oversight, even as they exercise[] power in the people's name." *See id.* at 497.

*First*, NLRB ALJs are insulated from the Board's oversight. Though appointed by the Board, NLRB ALJs may be removed "only for good cause," 5 U.S.C. § 7521(a), meaning gross derelictions of duty, not policy disagreements. *See Collins v. Yellen*, 141 S. Ct. 1761, 1786 (2021); *Shapiro v. SSA*, 800 F.3d 1332, 1336 (Fed. Cir. 2015).

*Second*, only Board members—not the President—can initiate removal of an ALJ. *See* 5 U.S.C. § 7521. Yet the Board's five members themselves can be "removed" only for "neglect of duty or malfeasance in office." 29 U.S.C. § 153(a). The President thus cannot control termination proceedings against ALJs.

*Third*, a separate agency, the MSPB, decides whether to remove an ALJ. 5 U.S.C. § 7521. So even if the President could persuade the NLRB to hold an ALJ accountable, the most the Board can do is initiate removal proceedings. The MSPB makes the ultimate decision. But MSPB members too are removable only for "inefficiency, neglect of duty, or malfeasance in office."

*Id.* § 1202(d). Even if the President could cajole the NLRB into initiating termination proceedings, a recalcitrant MSPB could *still* decide to keep the ALJ in place and the President could do little about it. The Fifth Circuit in *Jarkesy v. SEC* thus held that SEC ALJs' similar removal protections unconstitutionally undermine the President's "ability to take care that the laws are faithfully executed." 34 F.4th 446, 463-64 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023).

c. Starbucks can challenge ALJs' constitutionality before this Court, despite not doing so before the NLRB, because the NLRA does not require exhaustion of structural separation-of-powers challenges. Under the NLRA's exhaustion provision, 29 U.S.C. § 160(e), parties may raise new issues in court if "extraordinary circumstances" excuse any failure to exhaust in agency proceedings. Under this Court's cases, the "extraordinary circumstances" exception encompasses challenges which "go to the very power of the Board to act and implicate fundamental separation of powers concerns," such as this one. *Advanced Disposal*, 820 F.3d at 598 (citation omitted). Requiring exhaustion would be particularly inappropriate given that "[c]laims that tenure protec-

tions violate Article II" are "outside [agencies'] expertise" and power to remedy. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 194 (2023) (citation omitted).[2]

3. As to remedy, this Court should declare the NLRB ALJ's multilayer tenure protection unconstitutional, vacate the NLRB's decision, and remand for further proceedings before a constitutionally accountable adjudicator.

Starbucks faces further proceedings before an unconstitutionally insulated ALJ, a "here-and-now injury" warranting prospective relief. *Free Enter. Fund*, 561 U.S. at 513 (citation omitted); *Axon*, 598 U.S. at 191 (citation omitted). If this Court remands on any other issue, Starbucks will be right back before an unconstitutionally insulated ALJ. Even if this Court grants the NLRB's petition for enforcement, Starbucks faces compliance-stage proceedings on compensatory damages before an unconstitutionally insulated ALJ. NLRB, *Casehandling Manual, Part 3, Compliance Proceedings* § 10506.9 (Oct. 19, 2020), https://tinyurl.com/rfbwchwd. To ensure that any future proceedings will be before an accountable adjudicator, this Court should hold

---

[2] *Advanced Disposal*, 820 F.3d at 598, 600; *see generally Carr v. Saul*, 141 S. Ct. 1352 (2021) (excusing failure to exhaust Appointments Clause challenge because, *inter alia*, "agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise").

NLRB ALJs' removal protections unconstitutional now, as the Fifth Circuit did when vacating an SEC order on other grounds. *Jarkesy*, 34 F.4th at 463 n.17.

Even if this Court views relief as retrospective and requires Starbucks to show prejudice, vacatur is warranted. In *Collins*, 141 S. Ct. at 1787, the Supreme Court invalidated a removal protection insulating the Federal Housing Finance Agency's Director. The challengers' requested relief was purely retrospective, so the Court required a showing of prejudice—tying relief to whether, absent the removal restriction, the affected official "might have altered his behavior." *Id.* at 1789. Here, even if Starbucks must show prejudice, the ALJ "might have altered his behavior" given presidential supervision. *See id.* Extra accountability may have prompted the ALJ to, for instance, look more carefully at Starbucks' valid justifications for terminating Nowakowska and Bussiere. *Infra* pp. 30-39. At a minimum, *Collins* warrants a remand for discovery into whether "the unconstitutional removal restriction inflicted harm," 141 S. Ct. at 1789, including whether the multilayered removal protections influenced the Board's decision-making.

## II.    The Board's Decision Violates the Substantial-Evidence Standard

This Court should also vacate the Board's order because it is unsupported by substantial evidence, *i.e.*, enough "relevant evidence" to convince a "reasonable mind" to accept the Board's "conclusion." *Advanced Disposal*, 820 F.3d at 606 (citation omitted); *see* 29 U.S.C. § 160(e)-(f). This Court has repeatedly vacated similar NLRB orders for failing to "take into account whatever in the record fairly detracts from" its reasoning. *Advanced Disposal*, 820 F.3d at 606 (citation omitted); *accord FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 122 (3d Cir. 2022); *ImageFIRST*, 910 F.3d at 736; *MCPC, Inc. v. NLRB*, 813 F.3d 475, 492-93 (3d Cir. 2016).

This order reflects the same flaws. Adopting the ALJ's analysis, the Board concluded that Starbucks unlawfully terminated these partners only by brushing aside uncontested record evidence showing that Nowakowska and Bussiere repeatedly violated Starbucks' policies. And, as to Nowakowska's reduced hours, the NLRB ignored evidence that Starbucks reduced her hours in an across-the-board staffing reduction.

### A.    The NLRB's Finding of Unlawful Terminations Ignored Evidence of Repeated Policy Violations and Disruption

Adopting the ALJ's reasoning, the Board held that Starbucks terminated Nowakowska and Bussiere for their labor organizing. That conclusion

is not supported by substantial evidence.  To start, the ALJ agreed that Starbucks requires all partners to follow "policies" in its "Partner Guide," which includes requirements to satisfy performance expectations and avoid "serious misconduct" like "abusive behavior toward … customers" or "[i]nsubordination."  JA1029.  Uncontroverted record evidence shows that Starbucks terminated Nowakowska because she repeatedly violated that policy, and that Bussiere likewise failed Starbucks' performance standards by consistently disrupting other employees thus reducing store efficiency.   The NLRB's "fail[ure] to address the evidence" warrants vacatur.  *See ImageFIRST*, 910 F.3d at 736.

1. ***Nowakowska.***  Applying the Board's two-step *Wright Line* test for labor retaliation, the ALJ found that Starbucks terminated Nowakowska for her labor-organizing activities.  *See Wright Line*, 251 NLRB 1083, 1087 (1980).  Under *Wright Line,* the NLRB first must show that "union animus was a substantial or motivating factor in the adverse employment action."  JA30-31.  Then, the "burden shifts to the employer" to show that it would have taken the same action "even in the absence of the protected conduct."  JA31.

Here, the ALJ concluded that (1) Nowakowska's "protected activities" were a motivating factor in Starbucks' decision to terminate her, and (2) Starbucks would not have independently terminated her for insubordination and rudeness to customers. JA34-35. But the ALJ focused almost exclusively on the first finding that Nowakowska's protected, labor-organizing activities were a motivating factor in Starbucks' termination decision. JA31, 34-35.

By contrast, the ALJ devoted just one conclusory paragraph to rejecting Starbucks' explanation for why Starbucks would have terminated Nowakowska even "in the absence of her protected activities." JA35. According to the ALJ, the only possible basis for Nowakowska's termination was a January 22, 2020 incident where all agree Nowakowska provided lackluster "customer service" and was "intemperate or rude" to a customer who sought to avail himself of a holiday promotion by asking for free tea bags. JA25, 35.

Specifically, all agree that after some "back and forth" on the terms of the promotion, Nowakowska blew up when the customer proceeded to ask for free butter, getting "exasperated" and exclaiming: "[N]ow you want free butter?" and upsetting the customer to the point where he "asked for the man-

32

ager's card." JA277-79.  Nonetheless, the ALJ found that this incident in iso-lation did not justify Nowakowska's firing due to an absence of "a pattern of discharging partners for comparable conduct."  JA35.

That reasoning flunks the substantial-evidence test by ignoring undis-puted evidence of many other infractions.  As Nowakowska's termination no-tice explained, the January 22, 2020 incident was merely the latest example of Nowakowska's "continued failure to act in accordance with Starbucks guiding principles … as outlined in the Barista job description."  JA1436.  Especially striking, the Board failed to consider other infractions that Nowakowska *ad-mitted* to—even though the ALJ found Nowakowska to be a compelling wit-ness with a "clear, consistent, and detailed recollection."  JA21 n.13.  The Board thus ignored undisputed evidence that Nowakowska had violated Star-bucks customer-service policies for months before finally pushing the envelope too far by blowing up at a customer over free butter.  For instance:

- On November 27, 2019, Nowakowska undisputedly raised her voice at David Vaughan—the store manager—in front of customers, prompting Vaughan to ask her "communicate with [him] different[ly]."  JA258, 261-62.  Though the ALJ credited Nowakowska's version of events over Vaughan's, JA23 n.22, Nowakowska admitted to "yelling" to be heard

"over the sound of everything" going on in the store, JA262. But Starbucks policy requires partners to "communicate with other partners … in a professional and respectful manner at all times." JA1024.

- On October 23, 2019, Nowakowska upset a customer by not letting her know that a drink was ready. JA222. Nowakowska disputed whether the customer was upset, but admitted failing to "keep calling out the customer's name." JA222. Starbucks' Partner Guide requires baristas to offer "excellent customer service" at all times, as partners' core function. JA995.

- On October 29, 2019, Nowakowska slammed drinks on the counter and failed to greet or thank customers. JA228. Nowakowska denied slamming drinks, but acknowledged previous counseling for falling short of Starbucks' courtesy standards by failing to greet customers. JA230, 307. And she acknowledged that Manager Vaughan had previously "talk[ed] to" at least three other baristas for similarly failing to greet customers. JA230-31.

Starbucks' Partner Guide makes clear that Starbucks may terminate employees for even single instances of "abusive behavior toward … customers" or "[i]nsubordination." JA1029. Those cumulative infractions, leading up to

34

Nowakowska's more serious violations in January 2020, presented clear-cut grounds for severing employment.  The ALJ did not grapple with Nowakowska's track record, instead describing her "intemperate and rude" treatment of a customer over free-butter as an "isolated" incident.  JA35.  Nowakowska's own testimony—and the rest of the record—belie that characterization.

The ALJ acknowledged that Starbucks *had* fired other partners for rudeness to customers, like getting in a "heated argument" with a customer and "respond[ing] rudely" when a customer complained about an incorrect drink order.  JA34-35.  But the ALJ deemed Nowakowska's behavior not "comparable."  JA35.  That conclusion again looks only to the January butter incident in isolation, not at the broader track record of insubordination and poor performance.  JA35.  And Starbucks established that it had terminated other partners for rudeness to customers coupled with other policy violations.  JA456-57, 702, 714.

This Court has repeatedly vacated decisions like this when the Board did not confront evidence cutting against its position.  An ALJ may not "ignore relevant evidence," *ImageFIRST*, 910 F.3d at 736, or "context," *FDRLST Media*, 35 F.4th at 122.  And an ALJ may not turn an employer's "limited" burden

to show that the employer would have terminated the employee for lawful reasons into an insurmountable hurdle, given "the employer's general freedom to discharge an employee for a good reason, a poor reason, or no reason at all." *MCPC*, 813 F.3d at 487 (citation omitted). Starbucks' termination of Nowakowska for repeatedly violating company policy was amply justified.

2. ***Bussiere***. Again applying the *Wright Line* labor-retaliation test, the ALJ found that Starbucks fired Bussiere for "protected activities" like protesting workplace conditions, not unprotected workplace misconduct. JA35-36. But the ALJ again ignored uncontroverted evidence showing that Starbucks fired Bussiere for disrupting other workers, making it harder to run the store efficiently.

Starbucks' termination notice gave two reasons for firing Bussiere: (1) he "knowingly" spread "false information" about the rumored discharge of another barista, and (2) that incident was merely the latest example of Bussiere "disrupting operations and partners while they are working." JA1456. Both grounds violated Starbucks' policies requiring treating colleagues with "dignity and respect." JA991.

The ALJ only addressed the first reason, finding that Starbucks did not show that "Bussiere *knew* the rumor … was false."  But the ALJ did not explain why Starbucks' second, independent reason for terminating Bussiere—his persistent disruptive behavior—was insufficient.  JA36.  The ALJ merely held that Starbucks could not rely on the existence of a November 21 warning to Bussiere to establish disruptiveness.  JA36.  The ALJ deemed the warning itself an unfair labor practice on the theory that Starbucks chose to caution "Bussiere, in part, because … [he had] complain[ed] to coworkers about Vaughan's performance as store manager"—a protected activity.  JA33.

Critically, however, the ALJ did not reject the underlying facts or incidents detailed in the warning, which listed such misconduct as leaving the sales floor during Bussiere's shift and failing to wear his uniform.  Indeed, Bussiere admitted to those incidents, which violated Starbucks policy.  Thus, even spotting the ALJ the conclusion that the November 21 warning could not be used against Bussiere, the ALJ still needed to explain why undisputed evidence of Bussiere's disruptiveness would not justify his termination:

- In August and September 2019, Starbucks coached and then warned Bussiere for twice "arriving over an hour late for work."  JA21 n.15.  As

37

Starbucks' manual explains, such tardiness disrupts "a store's efficient operations."  JA1004.

- In October 2019 and "every few months" before that, Bussiere admitted that he repeatedly refused to follow his manager's requests to wear his Starbucks hat at work.  JA331.

- In November 2019, Bussiere admitted he "forgot to" stock the pastry case as required, leaving customers to guess which items were in stock. JA326-27.

- Sometime before December 18, 2019, Bussiere left another store short-staffed by agreeing to cover shifts for two partners who were scheduled to work at the same time.  JA24, 345.

- In January 2020, another partner emailed management that Bussiere was "distracting" and "having a deleterious impact on partner morale." JA25 n.29.  The partner complained that the store was "slowly being pulled down" by Bussiere's unproductive antics.  JA27 n.32.

- In February 2020, Bussiere mocked a manager who tried implement a new employee-break policy—telling the manager that if she was going to time his breaks, he would time hers too.  JA27 n.30.  That manager found it difficult to work with Bussiere because he "was constantly …

38

following [her] around and trying to find everything [she] was doing wrong." JA559. The ALJ acknowledged this incident elsewhere in the decision, JA27 n.30, yet did not analyze its role in Bussiere's firing.

The ALJ confronted none of that evidence when holding that Starbucks had "failed to establish that it would have discharged Bussiere in the absence of his … union activities." JA36. The ALJ's singular focus on Starbucks' allegation that Bussiere spread false rumors, at the expense of considering extensive evidence of broader problems, violates the substantial-evidence standard. That omission is particularly striking because a Starbucks regional director testified that Starbucks considered Bussiere's disciplinary history when deciding to fire him. JA582.

This Court has found substantial evidence lacking where the NLRB failed to give "due consideration" to "those parts of the record supporting" the employer's "contention that it would have discharged [the employee] regardless." *MCPC*, 813 F.3d at 492. This case is no different: The ALJ brushed aside evidence of Bussiere's prolific disruptiveness when deeming his termination unlawful. The Board's decision on this charge thus also warrants vacatur. *See ImageFIRST*, 910 F.3d at 736.

39

**B.      The NLRB's Finding of Unlawfully Reduced Hours Ignored Business and Performance Justifications**

The ALJ found that Starbucks reduced Nowakowska's hours in retaliation for participation in a July 22, 2019 protest at the Broad & Washington store.  JA32-33.  But again, the ALJ focused on the first step of the *Wright Line* retaliation test—whether Nowakowska's labor organizing motivated her reduced hours—while giving short shrift to Starbucks' second-step rejoinder that business reasons prompted the reduction.  JA33.  In rejecting Starbucks' explanation, the ALJ noted that Nowakowska's "was one of the largest reductions in hours," and that "Starbucks increased the scheduled hours of two partners."  JA33.  But the ALJ repeatedly disregarded undisputed evidence refuting those points, a mistake that warrants vacatur.  *See MCPC*, 813 F.3d at 492.

*First*, the record shows that Starbucks reduced Nowakowska's hours as part of an across-the-board staffing cut.  "[F]or the first several months" the Broad & Washington store was open, Starbucks intentionally overstaffed, aiming "to provide a great Starbucks experience" and to "grow" the "store's potential for sales."  JA520.  But in September 2019, Starbucks stopped "overstaff[ing]" the store, reducing hours across-the-board to fit expected customer traffic.  JA463.  By late September, baristas were collectively scheduled for about 310 hours; by December, they were scheduled for a total of around 240

hours. JA653-54, 666.[3] As store hours overall decreased, Nowakowska's hours decreased proportionally. For example, between September and November 2019, when store hours overall dropped 40%, Nowakowska's dropped 44%. JA1681-84, 1714-15. Starbucks cut other partners' schedules and Nowakowska's too. JA237-38, 463.

*Second*, after the cuts, Nowakowska worked the same number of hours as other baristas, undermining any differential treatment. *Contra* JA33. In November 2019, Nowakowska worked 112 hours; two other baristas (Puig and Rusili) worked 115 and 119 hours, respectively. JA1714-15. Similarly, Nowakowska's December 2019 hours (88) were similar to or greater than other baristas', including Rusili (95) and Ayers (61). JA1720-21. Shift supervisors worked similar hours; one (Kirchner) for instance worked 51 hours in December, and like baristas Nowakowska and Rusili saw a 20% reduction in

---

[3] The ALJ exaggerated the cuts by mixing and matching statistics. The ALJ claimed that before the cuts, "partners were collectively scheduled for a total of around 450 hours" and afterwards they were scheduled for just "220 hours." JA21 n.16. But the 450 number includes *all* partners—including shift supervisors and the store manager—whereas the 220 number apparently counts just baristas. JA653-54, 666. In reality, baristas collectively worked only about 310 hours before the cuts and 240 after. JA653-54, 666.

hours between November and December.  JA1720-21.  The ALJ omitted the fact that Nowakowska's hours were average in November and December.

*Third*, the ALJ relied on the unsupported assertion that two baristas—Shams and Siburt—got increased hours despite the cuts.  But in November, Shams worked a reduced schedule, likely because he took time off.  JA661-66.  Thus, the increase in Shams' hours between November and December is artificial.  And though Siburt got more hours, she often worked the night shift.  JA661-72.  Nowakowska had the same opportunity to work nights for more hours, but declined.  JA301.  The ALJ's factual mistakes show that the ALJ's conclusions were not "reasonable inferences" supported by "the record."  *Advanced Disposal*, 820 F.3d at 606.

## III.  Nowakowska's and Bussiere's Violation of Starbucks' Recording Policy Precludes Reinstatement and Backpay

Even were Nowakowska's and Bussiere's terminations unlawful, the NLRB incorrectly awarded reinstatement with backpay.  The NLRA does not require employers to reinstate employees or pay full backpay—even after an unfair labor practice—when "after-acquired evidence" demonstrates that the employer "would have discharged [the employee] anyway."  *1621 Route 22 W. Operating Co. v. NLRB*, 825 F.3d 128, 149 n.14 (3d Cir. 2016) (no reinstatement); *see Marshall Durbin Poultry Co.*, 310 NLRB 68, 70 (1994), *enf'd in*

*part* 39 F.3d 1312 (5th Cir. 1994) (no backpay from date employer acquires knowledge of misconduct).

Here, Nowakowska's and Bussiere's pervasive recording of fellow partners and customers without consent in violation of Starbucks policy and Pennsylvania law amply justifies their terminations. Starbucks takes secret employee recordings extremely seriously. The Partner Guide makes clear that "audio recording … of other partners or customers in the store without their consent is not allowed unless authorized by law." JA1018. Undisputed evidence showed that Starbucks fired at least two other Philadelphia-area partners for secretly recording their coworkers. JA36 n.54. And Starbucks considers recordings of *customers* especially grave. Customers come to Starbucks to enjoy their coffee and catch up with friends. Secret recordings destroy the customer trust that is the cornerstone of Starbucks' business. Pennsylvania law also makes it a felony to "intentionally intercept[]" oral communications without consent. 18 Pa. Cons. Stat. Ann. § 5703(1).

The Board rejected Starbucks' after-acquired-evidence defense, reasoning that (1) Starbucks "knew of the recording activity" before firing Nowakowska and Bussiere, and (2) the NLRA protected their secret recordings, which

accordingly could not form the basis for firing.  JA11-12 & n.19.  Neither rationale withstands scrutiny.

1.  First, the Board's conclusion that Starbucks actually knew about Nowakowska's and Bussiere's pervasive recordings is not supported by substantial evidence.  As the Board observed, an employer may raise an after-acquired-evidence defense whenever the employer lacked actual knowledge of the misconduct at the time of the firing.  JA11; *see McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 359-60 (1995).  The Board thus correctly rejected the ALJ's misimpression that Starbucks merely needed "reason to know" of the recordings.  JA43-44.

But no evidence supports the Board's conclusion that Starbucks actually knew about Nowakowska's and Bussiere's recordings of anyone else.  The Board based its finding on "several instances of Nowakowsa and Bussiere using recording devices in interactions with Store Manager Vaughan," and Vaughan and another manager's reports of those incidents.  JA11.  The "several" instances are two.  Once, Vaughan thought Bussiere might be recording him, but Bussiere unequivocally denied doing so.  JA37, 434.  And once, Nowakowska pulled out her phone to record, and Vaughan ended the conver-

sation immediately.  JA37, 435.  Those two unsuccessful attempts at recording—one of which Bussiere emphatically denied—do not show Starbucks' actual knowledge that Nowakowska or Bussiere were recording Vaughan, let alone knowledge that they were recording other partners and customers.

The ALJ, but not the Board, also pointed to "transcripts" of conversations with Vaughan that Bussiere sent to management, citing those transcripts as evidence that "Starbucks knew or had reason to know" of Bussiere's recording.  JA37-38.  Given that the Board rejected the ALJ's "reason to know" standard, JA11 n.19, 43-44, it is unclear whether the Board relied on these incidents in finding actual knowledge.

Regardless, Bussiere never told managers how he created or obtained these "transcripts," which mixed purported quotes and editorializing.  Given Starbucks' strict ban on workplace recordings, the more reasonable inference was that Bussiere was reconstructing what was said—not admitting to a flagrant policy violation that would have justified on-the-spot termination.  That the "transcripts" might have warranted suspicion as to whether Bussiere was recording Vaughan does not prove Starbucks actually knew that Bussiere was recording Vaughan, let alone anyone else.

Certainly, the record contains zero evidence suggesting that Starbucks knew that Nowakowska and Bussiere were recording coworkers and customers. Every incident the NLRB or ALJ invoked involved an attempt to record Manager Vaughan. But at the ALJ hearing, it emerged that Bussiere had made *dozens* of recordings of his entire shift. JA353-54. Nowakowska too made at least two recordings in customer areas of the store. JA190-91, 204-05. Even had Starbucks known that Nowakowska and Bussiere were recording Vaughan (it did not), the egregiousness of surreptitiously recording customers and coworkers would have independently justified termination. Given that "virtually no evidence" supports the Board's actual-knowledge finding, that finding by definition fails "substantial evidence" review. *See Rapid Mfg. Co. v. NLRB*, 612 F.2d 144, 145 (3d Cir. 1979).

2. The NLRB alternatively held that even were Starbucks unaware of Nowakowska's and Bussiere's recordings, those recordings could not justify termination because the NLRA protects any surreptitious recordings purportedly "made to … preserve evidence" of unfair labor practices. JA6. The NLRA's text and the Board's own precedent refutes the conclusion that all recordings here were protected.

46

Section 7 of the NLRA protects employees' right to join unions, bargain collectively, and "engage in other concerted activity for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. "[T]he touchstone" for whether an employee is engaged in protected activity is "whether the employee intends to induce group activity or whether the employee's action bears some relation to group action in the interest of the employees." *MCPC*, 813 F.3d at 484.

The NLRB has interpreted section 7 to protect workplace recordings "if employees are acting in concert for their mutual aid and protection and no overriding employer interest is present." *Whole Foods Mkt., Inc.*, 363 NLRB 800, 802 (2015). For instance, the Board has held that section 7 protected a group of employees who agreed to record a disciplinary meeting with a manager conducted without a union representative. *Stephens Media, LLC*, 356 NLRB 661, 661 (2011). The employees "act[ed] in concert to document what they perceived to be a potential violation of employee rights," so section 7 applied. *Id*. Likewise, the Board has held that section 7 protected a union steward who recorded an employer meeting discouraging employees from joining a union. *ADT, LLC*, 369 NLRB No. 23, 2020 WL 591740, at *1 (2020). And

47

the Board has held that section 7 protected a union steward recording a termination meeting to "preserv[e] evidence for use in a possible grievance." *AT&T Mobility, LLC*, 370 NLRB No. 121, 2021 WL 1815083, at *6 (2021).

Starbucks takes no issue with those NLRB precedents here, which at most establish that employees may collaborate to record private meetings with managers where they reasonably expect unfair labor practices to occur. But Nowakowska's and Bussiere's recordings stepped well beyond that line.

To start, many of Bussiere's recordings were not "concerted"—the key prerequisite for section 7 protection. *See* 29 U.S.C. § 157. Bussiere acted alone, making his conduct fundamentally unlike Board cases where employees agreed in advance to record, *e.g.*, *Stephens Media*, 356 NLRB at 661, or acted in their capacity as union representatives, *e.g.*, *ADT*, 2020 WL 591740, at *1; *AT&T*, 2021 WL 1815083, at *6. While a union member at another company told Bussiere that her union "record[ed] meetings with management" and Bussiere told Nowakowska about one recording in advance, nothing suggests Bussiere coordinated his recordings with other employees. JA320, 354. Rather, Bussiere testified: "I started just recording." JA353. The NLRA does not protect that kind of "individual" activity. *Mushroom Transp. Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir. 1964).

Both Nowakowska's and Bussiere's recordings in public areas of the store also impinged Starbucks' "overriding employer interest" in customer and employee privacy. *See Whole Foods*, 363 NLRB at 802. Bussiere's 30-plus recordings lasted entire shifts in public areas of the store, capturing coworkers and customers. *See, e.g.*, JA1610 ("Good, how are you. Can I get a tall (indiscernible)."). Nowakowska at least limited her secret recordings to discrete meetings with management, but she too intruded on coworkers and customers by surreptitiously recording them in public areas, JA190-91, 204-05. Even assuming the NLRA protected employees secretly recording private disciplinary meetings with management, the NLRA does not let employees systematically record colleagues and members of the public without their consent in hopes of capturing a manager's "hostile" comment. *See* JA354.

The Board dismissed Starbucks' legitimate concerns with employee and customer privacy, insisting that "[i]t is hard to imagine how" Bussiere could have avoided recording nonmanagers "in the circumstances of this case." JA46. That assumes the incorrect conclusion that the NLRA authorizes blanket recordings of *all* interactions with management, regardless of others' privacy. As previous NLRB cases recognize, the Board must balance legitimate

49

employer privacy interests against the asserted need to record.  *See Whole Foods*, 363 NLRB at 802.

In sum, the NLRA does not protect these recordings.  Nowakowska and Bussiere were "not engaged in concerted activities within the protection of Section 7," and the NLRB failed to consider legitimate privacy interests.  So Starbucks' after-acquired evidence of their violations of Starbucks' no-recording policy precludes reinstatement or full backpay.  *See Mushroom Transp.*, 330 F.2d at 685; *1621 Route 22*, 825 F.3d at 149 n.14.

At very least, the APA requires the Board to "present a reasoned explanation" "when it departs from controlling precedent."  *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 153 (3d Cir. 1994).  Agencies violate the APA when they "purport[] to follow [their] precedents but then fail[] to apply the standard set forth in those decisions."  *Apache Corp. v. FCC*, 627 F.3d 1220, 1223 (D.C. Cir. 2010) (Kavanaugh, J.).  Here, the NLRB cited past cases permitting targeted recordings of management, but never explained how those decisions possibly justified the mass recording of customers and coworkers.  That failure to explain violates the APA and warrants vacatur.

## IV.    The NLRB's Damages Remedy Is Unlawful

At a minimum, this Court should vacate the NLRB's award of compensatory damages.  Recently, the NLRB bucked decades of precedent and asserted the authority to award employees "all direct or foreseeable pecuniary harms" as a matter of course.  *Thryv*, 2022 WL 17974951, at *1.  Here, the Board applied that ruling retroactively and compelled Starbucks to "compensate Bussiere and Nowakowska for any direct or foreseeable pecuniary harms incurred as a result of the unlawful adverse actions."  JA7 n.3.

That broad compensatory-damages remedy exceeds the Board's powers.  Section 10(c) of the NLRA confines the Board to traditional equitable remedies, *i.e.*, ordering the cessation of unfair labor practices or "affirmative action … as will effectuate the policies of" the Act. 29 U.S.C. § 160(c).  Further, constitutional-avoidance principles disfavor the Board's interpretation, given the grave constitutional concerns under Article III and the Seventh Amendment that would arise if agencies—not courts—resolved traditional common-law tort and contract claims.  The Supreme Court is currently evaluating similar constitutional concerns in *Jarkesy*, No. 22-859 (argued Nov. 29, 2023).  In addition, the Board's assertion of unbounded remedial powers raises concerns under the nondelegation doctrine.  And the Board's *sua sponte* imposition of a

51

new form of damages in its final decision—without notice to Starbucks—violates due process.

## A.    The NLRB Awarded Compensatory Damages

In *Thryv*, the Board "revisit[ed]" its "standard remedy" in unfair-labor-practice cases and charted a novel course. 2022 WL 17974951, at *9. By a 3-2 vote, the Board decided that, "to best effectuate the purposes of the Act," the Board would now award compensation for "all direct or foreseeable pecuniary harms." *Id.* at *1. As the majority observed, "myriad … possible examples" might fit that new definition, including credit-card fees, mortgage payments, childcare bills, and medical expenses. *Id.* at *14-15 (citation omitted).

The Board implemented that new interpretation here, requiring Starbucks to make Nowakowska and Bussiere "whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the discrimination against them." JA13. For example, the Board ordered Starbucks to pay "reasonable search-for-work and interim employment expenses." JA7 n.3.

The Board's order thus compels Starbucks to pay compensatory damages—a remedy "intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm v.*

52

*Campbell*, 538 U.S. 408, 416 (2003) (citation omitted).  In wrongful-discharge tort cases, "[c]ompensatory damages" "compensate victims to the full extent of the loss sustained as a direct result of the injury." *Carlini v. Glenn O. Hawbaker, Inc.*, 219 A.3d 629, 644 (Pa. Super. Ct. 2019) (citation omitted).  For example, tort-law "compensatory damages" include the "expenses of finding new employment," *Smith v. Atlas Off-Shore Boat Serv., Inc.*, 653 F.2d 1057, 1064 (5th Cir. Unit A Aug. 1981), just like the "search-for-work" expenses the Board ordered here, JA7 n.3.  Indeed, the Board's own manual confirms that certain expenses, "such as the loss of a car or house due to the discriminatee's inability to make monthly payments" are "compensable damages."  NLRB, *Casehandling Manual, supra*, § 10536.1.

## B.     The NLRA Does Not Authorize Compensatory Damages

Section 10(c) of the NLRA authorizes the NLRB to order employers to "cease and desist from" unfair labor practices and "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the NLRA]." 29 U.S.C. § 160(c).  That language authorizes only equitable relief.  Section 10(c) does not authorize compensatory damages—"the classic form of *legal* relief." *See Mertens v. Hewitt Assocs.*,

508 U.S. 248, 255 (1993); *see also Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).  Thus, this Court should vacate the compensatory-damages portion of the Board's Order.

1. ***Statutory Text***.  The NLRA's text and longstanding Supreme Court precedent confirm that the Board lacks power to order legal remedies, including compensatory damages.  Section 10(c) lets the Board order employers to "take … affirmative action," such as "reinstatement … with or without back pay," or to compel inaction, *i.e.*, to "cease and desist."  29 U.S.C. § 160(c).  That remedial power captures equity to a T:  Equity "compel[s] action or inaction."  Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 553 (2016).  Courts of equity could both order "restraint of a contemplated or threatened action" and "require affirmative action."  *Ex parte Lennon*, 166 U.S. 548, 556 (1897).  The NLRB's remedial powers are identical, and conspicuously omit any reference to damages—the quintessential legal remedy.

Thus, nearly 70 years ago, the Supreme Court recognized "Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct."  *UAW-CIO v. Russell*, 356 U.S. 634, 643 (1958).  For example, the Court observed that "medical expenses … are beyond the scope of present Board remedial orders."  *Id.* at 646.

54

Such relief would "supersed[e] common-law actions" to "recover damages caused by … tortious conduct." *Id.* at 642. Yet that is exactly the type of compensatory, common-law relief the Board sought here.

Moreover, the Supreme Court has repeatedly described the NLRB's section 10(c) authority in purely equitable terms. The Court has deemed NLRB "cease and desist" orders "somewhat analogous" to "injunction[s]"— the classic equitable remedy. *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). The Court has compared an NLRB order requiring an "affirmative action" to a "mandatory injunction[]." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 178 n.4 (1973). And the Court has described section 10(c) relief as "discretionary," *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197 (1941)—another hallmark of equity, *see Salazar v. Buono*, 559 U.S. 700, 714 (2010) (plurality op.). All of this reinforces section 10(c)'s bright-line distinction: The Board can pick equitable remedies, but legal remedies like compensatory damages are off-limits.

2. ***Context.*** The rest of section 10(c)'s text reinforces that the NLRB's remedial power is only equitable. Section 10(c)'s sole example of an order commanding "affirmative action" is "reinstatement of employees with or without backpay." 29 U.S.C. § 160(c). As this Court has observed, "[r]einstatement is

an equitable remedy." *Squires v. Bonser*, 54 F.3d 168, 171 (3d Cir. 1995) (discussing 42 U.S.C. § 1983).  The same goes for backpay.  *Curtis v. Loether*, 415 U.S. 189, 197 (1974) ("In Title VII cases the courts of appeals have characterized back pay as an integral part of an equitable remedy.").  When the NLRB includes backpay in a reinstatement order, the Board's combined relief is an equitable "form of restitution."  *See id.*

Meanwhile, reading section 10(c) to let the Board award compensatory damages would create serious anomalies.  As noted, section 10(c) spells out "affirmative action" the Board can impose including "reinstatement with or without back pay."  29 U.S.C. § 160(c).  But section 10(c) also prohibits the Board from ordering "reinstatement" or "back pay" where the employee "was suspended or discharged for cause."  *Id.*  If the Board could order other remedies, that restriction makes no sense.  The Board would apparently remain free to award compensatory damages and other unspecified remedies to employees who were fired for cause but nonetheless affected by unfair labor practices.  Courts ordinarily interpret statutes to avoid such "anomalous results." *Cortez Byrd v. Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 202 (2000).

3. ***Other Statutes.***  Related statutes further show that section 10(c) authorizes only equitable relief.  When enacting Title VII of the Civil Rights Act

in 1964, Congress "modeled" that Act's remedial provision—section 706(g)—on section 10(c). *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975). Section 706(g) is expressly limited to equitable relief: A court may "enjoin [an employer] from engaging in [an] unlawful employment practice, and order such affirmative action as may be appropriate, which may include … reinstatement …, with or without back pay …, or any *other equitable relief*." 42 U.S.C. § 2000e-5(g)(1) (emphasis added). That language evinces Congress's understanding that stopping employers from acting unlawfully and ordering "affirmative action" such as "reinstatement" are forms of "equitable relief."

Buttressing the point, the Supreme Court has used section 10(c)'s "meaning" as "guidance as to the proper meaning of the same language in § 706(g)." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 849 (2001). And the Court has held that section 706(g) "does not allow awards for compensatory … damages." *United States v. Burke*, 504 U.S. 229, 238 (1992). Precisely because Title VII's original remedies excluded compensatory damages, in 1991 Congress amended Title VII to let victims of intentional discrimination recover damages after a jury trial. *See id.* at 241 n.12. If section 706(g)'s original language does not authorize compensatory damages, neither does section

10(c)—particularly because section 706(g) is the "broader" of the two remedial provisions. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 770 n.29 (1976).

By contrast, when Congress wants to authorize compensatory damages, Congress says so directly and ensures that a court—not an agency—decides the case. For instance, the Labor-Management Relations Act creates a civil cause of action against unions for certain unfair labor practices and expressly authorizes an injured party to bring a district-court suit to "recover the damages by him sustained." 29 U.S.C. § 187(b). The Migrant and Seasonal Agricultural Worker Protection Act too permits district courts to award "all appropriate relief, including rehiring or reinstatement of the worker, with back pay, *or damages*." *Id.* § 1855(b) (emphasis added). And the Family and Medical Leave Act authorizes courts to award damages including "any actual monetary losses sustained." *Id.* § 2617(a)(1)(A)(i)(II).

Congress clearly knew how to provide for damages in myriad labor statutes. By excluding similar language from the NLRA, Congress declined to authorize compensatory damages in NLRA cases. *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (citation omitted) ("[D]ifferences in language … convey differences in meaning.").

4. ***Legislative History.*** The Act's legislative history further refutes the Board's newfound power to award compensatory damages. As originally drafted, the NLRA would have allowed the Board to order an employer "to take affirmative action, *or to pay damages*, or to reinstate employees." S. 2926, 73d Cong. § 205(c) (as introduced Mar. 1, 1934) (emphasis added), *reprinted in* 1 NLRB, *Legislative History of the National Labor Relations Act, 1935*, at 6-7 (1949). But business representatives raised "due process" concerns and that language was dropped—illustrating yet again that the NLRA's omission of damages as a remedy was intentional. *See Hearing on S. 2926 Before the S. Comm on Educ. & Lab.*, 73d Cong. 362 (1934) (statement of James A. Emery, Nat'l Ass'n of Mfrs.), *reprinted in* 1 NLRB, *Legislative History*, *supra*, at 396.

## C. Reading the NLRA to Permit Compensatory Damages Would Raise Multiple Constitutional Problems

This Court ordinarily "avoid[s] a statutory interpretation that creates constitutional issues." *Burton v. Schamp*, 25 F.4th 198, 212 (3d Cir. 2022). Reading section 10(c) to permit compensatory damages raises serious constitutional concerns under Article III, the Seventh Amendment, and the nondelegation doctrine—problems that Starbucks' reading avoids.

1. ***Article III and Seventh Amendment Problems.*** Article III and the Seventh Amendment reserve to courts—and, specifically, juries—the power to adjudicate private damages suits.  In *Jarkesy*, the Fifth Circuit held that the SEC's imposition of civil fraud penalties violates the Seventh Amendment because those proceedings are "akin to traditional actions at law to which the jury-trial right attaches." 34 F.4th at 451.  The Supreme Court is currently reviewing that decision. *Jarkesy*, No. 22-859 (argued Nov. 29, 2023).  Whatever the Supreme Court decides about SEC administrative penalties, the NLRB's award of compensatory damages to private parties strikes at the heart of the private rights the Constitution reserves to courts and juries.

Start with the basics:  Article III vests "[t]he judicial Power of the United States" in federal courts alone.  U.S. Const. art. III, § 1.  Assigning judicial power to executive-branch adjudicators violates the separation of powers and undermines "the integrity of judicial decisionmaking." *Stern v. Marshall*, 564 U.S. 462, 484 (2011).  As an exception, agencies can adjudicate so-called "public rights"—"matters which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018)

(cleaned up). But *private* rights, like "wholly private tort, contract, and property cases," must be decided by "Article III judges in Article III courts." *Stern*, 564 U.S. at 484, 490 (cleaned up).

In a similar vein, the Seventh Amendment guarantees jury trials "[i]n Suits at common law." U.S. Const. amend. VII. Thus, cases that involve private rights "must be tried under the auspices of an Article III court" with the "right to a jury trial whenever the cause of action is legal in nature." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

The NLRB's interpretation would violate those constitutional guarantees by arrogating to the agency the power to impose compensatory damages—"the classic form of legal relief." *See Mertens*, 508 U.S. at 255 (emphasis omitted). Such damages intrude into tort and contract claims—classic private rights that courts must adjudicate. *See Stern*, 564 U.S. at 490. Tort law's basic function is to "compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Curtis*, 415 U.S. at 195. "[I]n suits for breach of contract" too, "compensatory damages" are the "traditionally available" remedy. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 220-21 (2022) (citation omitted). By seeking to "restor[e]" employees "to the situation they would

have inhabited but for [an employer's] unfair labor practice," *Thryv*, 2022 WL 17974951, at *15, the NLRB intrudes into private-rights adjudications.

Indeed, since 1940 the Supreme Court has understood that NLRB proceedings are "not for the adjudication of private rights" based on the "narrowly restricted" nature of proceedings that have as their "immediate object" the prevention of unfair labor practices, not remedying individual employees' harms. *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 362-63 (1940). The NLRB's assertion of authority to "ensure[] affected employees are made whole for the consequences of [an employer's] unlawful conduct" strays beyond that mandate. *See Thryv*, 2022 WL 17974951, at *9.

In *Thryv*, the Board recognized that "consequential damages"—a type of compensatory damages—are "legal damages" "more suited for the common law of torts and contracts." *Id.* at *13-14. Yet the Board inexplicably disclaimed "Seventh Amendment concerns" for other compensatory damages, citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48 (1937). *Thryv*, 2022 WL 17974951, at *16. But *Jones & Laughlin* rejected a Seventh Amendment challenge to a Board order imposing reinstatement with backpay, not damages. 301 U.S. at 48. As the Supreme Court explained, the monetary relief there (backpay) was "incident to equitable relief" (reinstatement). *Id.* And

that makes sense because those two remedies traditionally go hand in hand. *Curtis*, 415 U.S. at 197.  By contrast, here, the Board held Starbucks liable for *all* "direct or foreseeable pecuniary harms," even harms not traditionally considered incident to equitable relief.  JA7 n.3.  As the *Thryv* dissenters observed, the Board has "obviously run[] headlong into the Seventh Amendment's guarantee of the right to have such claims tried before a jury."  2022 WL 17974951, at *27 (Kaplan & Ring, dissenting in part).

The Board's anticipated mechanics of calculating compensatory damages confirm the agency would supplant the jury's traditional role.  Courts rely on jury trials to fairly calculate damages awards and identify harms that are too remote to pin on defendants.  The NLRB envisions adjudicating the same in "compliance proceedings"—another round of full-bore agency adjudication.  *Id.* at *17 (majority op.).  Apparently, further ALJ proceedings on damages will ensue, where employees may testify, the NLRB may offer documentary evidence, and the agency will decide what injuries were "foreseeable."  *Id.* at *18-19.  That "time-consuming" and "wide-ranging" inquiry into damages falls beyond the NLRB's ken, and parallels private damages suits ordinarily decided by courts.  *See id.* at *27 (Kaplan & Ring, dissenting in part).

2. ***Nondelegation Problems.***  The NLRB's interpretation also raises serious nondelegation concerns, by handing the agency an apparent blank check to impose any remedy the agency sees fit.  Because Article I vests "[a]ll legislative Powers herein granted" in Congress, U.S. Const. art. I, § 1, Congress may not transfer "legislative power to another branch."  *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality op.); *accord United States v. Cooper*, 750 F.3d 263, 266 (3d Cir. 2014).  Accordingly, Congress cannot grant agencies standardless discretion over regulatory decisions, but must instead "suppl[y] an intelligible principle to guide the delegee's use of discretion."  *Gundy*, 139 S. Ct. at 2123 (plurality op.).

That "nondelegation inquiry" bears on "statutory interpretation."  *See id.*  Courts avoid reading statutes to create "unconstitutional delegation[s]."  *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 126 (2022) (Gorsuch, J., concurring).  For instance, the Sixth Circuit recently interpreted the Public Health Service Act as not authorizing a pandemic eviction moratorium to avoid "a nondelegation problem."  *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 672 (6th Cir. 2021).

So too here, the NLRB's interpretation raises profound nondelegation problems.  In the Board's view, section 10(c)'s reference to "affirmative action

… as will effectuate the policies of the [NLRA]," 29 U.S.C. § 160(c), lets the Board pick any remedy consistent with its own views of labor policy. *Thryv* even suggest "the limits of the Board's statutory remedial authority" might stretch far beyond compensatory damages. 2022 WL 17974951, at *10 n.10.

But the Supreme Court has long prohibited agencies from charting their own course based on their views of statutory policy. Since 1935, statutes allowing the President to regulate as would "tend to effectuate" or as "necessary to carry out" a statute's "purposes" have crossed the line. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 521 n.4, 541-42 (1935); *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 407, 430 (1935). This Court should not adopt an interpretation that runs headlong into nondelegation principles when another reading avoids them entirely. Traditional equity practice—not the NLRB's policy preferences—cabins the NLRB's discretion to pick remedies.

### D.    The Board's Remedy Violates Due Process as Applied Here

Even were the Board authorized to award compensatory damages generally, awarding that remedy here deprived Starbucks of fair notice. It is a "fundamental principle in our legal system … that laws which regulate persons or entities must give fair notice of conduct that is forbidden." *FCC v. Fox Tel-*

*evision Stations, Inc.*, 567 U.S. 239, 253 (2012).  That requirement equally extends to giving notice of "the severity of the penalty."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).  On top of that, a "higher standard of fair notice" applies in administrative-law cases because it is "harder to predict how an agency will construe a statute."  *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 251-52 (3d Cir. 2015).  Thus, "[i]t is undoubtedly inappropriate for agencies to create liability by advancing novel interpretations during administrative proceedings."  *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1118 (10th Cir. 2021).

Here, the Board's decision gave Starbucks no advance notice of the possibility of compensatory-damages liability—instead imposing that remedy *sua sponte* after years of agency proceedings.  When the alleged unfair labor practices happened in 2019 and 2020, NLRB precedent only permitted awards for backpay, benefits, and "search-for-work and interim employment expenses."  *King Soopers, Inc.*, 364 NLRB 1153, 1153 (2016), *enf'd in relevant part*, 859 F.3d 23 (D.C. Cir. 2017).  When the ALJ finished finding facts and adjudicating the alleged practices in 2021, the ALJ's decision parroted the NLRB's then-standard remedial language expressing those limitations.  JA39.  The Board's General Counsel took no exception to the ALJ's remedy, and the case was fully briefed before the Board by October 2021.

Then came the NLRB's December 2022 *Thryv* decision, where the Board "revisit[ed]" its practice and announced it would now order employers to "compensate affected employees for *all direct or foreseeable pecuniary harms* suffered as a result of the … unfair labor practice." 2022 WL 17974951, at *9. The Board *sua sponte* imposed that remedy here, JA7 n.3, expanding beyond the ALJ-ordered remedies to compel Starbucks to "compensate" the partners for "any direct or foreseeable pecuniary harms," JA13.

That retroactive application of "a new agency interpretation … contravenes the bedrock due process principle that the people should have fair notice of what conduct is prohibited." *See PHH Corp. v. CFPB*, 839 F.3d 1, 46 (D.C. Cir. 2016) (Kavanaugh, J.), *reinstated in relevant part*, 881 F.3d 75, 83 (D.C. Cir. 2018) (en banc). This Court should reject the NLRB's new policy of imposing compensatory damages and vacate the compensatory-damages award.

## CONCLUSION

Starbucks' cross-petition for review should be granted, and the NLRB's application for enforcement should be denied.

Respectfully submitted,

/s/ *Lisa S. Blatt*

MAURICE BASKIN

LITTLER MENDELSON, PC

*815 Connecticut Ave, N.W.,*

*Ste. 400*

*Washington, D.C. 20006*

LISA S. BLATT

(DC Bar No. 429544)

   *Counsel of Record*

SARAH M. HARRIS

AARON Z. ROPER

EDWARD L. PICKUP

JOSHUA A. HANLEY*

WILLIAMS & CONNOLLY LLP

  *680 Maine Avenue SW*

  *Washington, DC 20024*

  *(202) 434-5000*

  *lblatt@wc.com*

DECEMBER 1, 2023

*Admitted in Pennsylvania and practicing law in the District of Columbia pending application for admission to the D.C. Bar under the supervision of bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

## COMBINED CERTIFICATIONS

1. **Bar Membership**:  I certify that I am a member of this Court's Bar.

2. **Word Count, Typeface, and Type Style:**  I certify that this brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B) and 32(f) because the brief was produced using Microsoft Word and it contains 12,829 words, excluding those portions excluded by Rule 32(a)(7)(B)(iii).  I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because it has been prepared in the proportionally spaced typeface, Century Expanded BT, size 14.

3. **Service.**  I certify that on this date I am causing this brief to be filed electronically via the Court's CM/ECF system.  All participants in both consolidated cases are registered CM/ECF users and service will be accomplished using the CM/ECF system.

4. **Paper copies.**  I certify that the text of the electronic brief filed via ECF is identical to the text of the paper copies that will be delivered to the Court.

5. **Virus check.**  I certify that I have caused a virus check to be performed using the latest version of Symantec Endpoint Protection, Version 14.

/s/ Lisa S. Blatt
LISA S. BLATT

DECEMBER 1, 2023

**STATUTORY ADDENDUM**

# TABLE OF CONTENTS

29 U.S.C. § 157 ............................................................................1a

29 U.S.C. § 160 ............................................................................1a

**29 U.S.C. § 157.  Right of employees as to organization, collective bargaining, etc.**

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

**29 U.S.C. § 160.  Prevention of unfair labor practices**

**(a) Powers of Board generally**

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided*, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

**(b) Complaint and notice of hearing; answer; court rules of evidence inapplicable**

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to

the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of title 28.

**(c) Reduction of testimony to writing; findings and orders of Board**

The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided*, That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: *And provided further*, That in determining whether a complaint shall issue alleging a violation of subsection (a)(1) or (a)(2) of section 158 of this title, and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the opinion

that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint.  No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.  In case the evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

**(d) Modification of findings or orders prior to filing record in court**

Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it.

**(e) Petition to court for enforcement of order; proceedings; review of judgment**

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28.  Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board.  No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.  The findings of the Board

with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.  If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record.  The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order.  Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

## (f) Review of final order of Board on petition to court

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside.  A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28.  Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions

of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

**(g) Institution of court proceedings as stay of Board's order**

The commencement of proceedings under subsection (e) or (f) of this section shall not, unless specifically ordered by the court, operate as a stay of the Board's order.

**(h) Jurisdiction of courts unaffected by limitations prescribed in chapter 6 of this title**

When granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified or setting aside in whole or in part an order of the Board, as provided in this section, the jurisdiction of courts sitting in equity shall not be limited by chapter 6 of this title.

**(i) Repealed. Pub. L. 98-620, title IV, § 402(31), Nov. 8, 1984, 98 Stat. 3360**

**(j) Injunctions**

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

**(k) Hearings on jurisdictional strikes**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

**(*l*) Boycotts and strikes to force recognition of uncertified labor organizations; injunctions; notice; service of process**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: *Provided further*, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period: *Provided further*, That such officer or regional attorney shall not apply for any restraining order under section 158(b)(7) of this title if a charge against the employer under section 158(a)(2) of this title has been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: *Provided further*, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b)(4)(D) of this title.

**(m) Priority of cases**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of subsection (a)(3) or (b)(2) of section 158 of this title, such charge shall be given priority over all other cases except cases of like character in the office where it is filed or to which it is referred and cases given priority under subsection (*l*).